THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　Plaintiff,<br><br>　v.<br><br>THOMAS J. HERINK,<br><br>　　　　　　　Defendant. | 8:10CR169<br><br>**SENTENCING MEMORANDUM** |

This Sentencing Memorandum supplements findings made on the record at the defendant's sentencing hearing on June 21, 2012.

I. BACKGROUND

Defendant was charged with 14 counts of bank fraud in violation of 18 U.S.C. § 1343. Filing No. 1, Indictment. Pursuant to a binding plea agreement under Fed. R. Crim. P. 11(c)(1)(C), he entered a plea of guilty to Count I of the Indictment and the United States ("the Government") agreed to dismiss the remaining charges. Filing No. 90, Plea Agreement. The offense carries a maximum term of imprisonment of 30 years. 18 U.S.C. § 1343. The parties agreed to a maximum term of imprisonment of 48 months. Filing No. 90, Plea Agreement at 6. In the plea agreement, the Government submitted that the loss involved in the crime and the amount of restitution was approximately $8,053,000, but the defendant reserved the right to challenge the calculation. *Id.* at 7.

The court accepted the defendant's plea but deferred acceptance of the plea agreement pending the preparation of a Presentence Investigation Report (hereinafter, "PSR") by the United States Office of Probation (hereinafter, "the Probation Office") that calculated the defendant's sentence under the United States Sentencing Guidelines

("the Guidelines"). In the PSR, the Probation Office identified U.S.S.G. § 2B1.1 as the applicable Guidelines base offense level provision and determined that the defendant's base offense level should be 7. Filing No. 132, Revised PSR (sealed) at 22. It added a 20-level enhancement under U.S.S.G. § 2B1.1(b)(1)(1)(K) for an amount of loss of more than $7,000,000 but less than $20,000,000. *Id.* The losses reflected in the PSR are: $3,300,000 to UMB; $1,682,000 to TFS (now GE Capital); $2,100,000 to UFCC and $971,000 to EMCC, for a total amount of loss of $8,053,000. The Probation Office then subtracted three levels for the defendant's acceptance of responsibility under U.S.S.G. § 3E1.1 (a) & (b), resulting in a total offense level of 24. *Id.* at 23.

The defendant has no prior convictions or other criminal conduct and his criminal history category is I. *Id.* At criminal history category I and base offense level 24, Herink's sentencing range under the Guidelines is 51-63 months.

The following facts are set out in the PSR. See Filing No. 132, PSR (sealed). As part of a scheme or artifice to defraud, Herink provided materially false financial statements to lenders, that is, UMB and GE Capital, and bonding companies, UFCC and EMCC, in order to obtain various loans and construction bonds. *Id.* at 18. He failed to report a payroll tax liability of approximately $800,000. *Id.* Ultimately, the defendant defaulted on the loans and his projects failed, causing UMB Bank, TFS, EMCC and UFCC to lose money. *Id.* at 18-19.

Herink is 46 years old. *Id.* at 25. He has a college education. *Id.* at 27. He is divorced and is the father of six children, ages 10 to 19. *Id.* at 25. Herink is closely involved in his children's activities. *Id.* at 25-26. He is presently self-employed as a consultant. *Id.* at 31.

The defendant objected to the PSR's calculations of loss. Filing No. 110. He also moved for an outside-Guidelines sentence. *Id.* He argues that the loss was not reasonably foreseeable under U.S.S.G. § 2B1.1(b)(1) & (2), app. n.3. He further contends the Guidelines calculation dramatically overstates the seriousness of his conduct. He argues that business reasons unrelated to the fraud contributed to the failure of the defendant's now-defunct construction company, Golf Services Group, Inc. ("GSG") including employee theft, work stoppage, slow payments, and economic conditions. Filing No. 111, Index of Evid., Ex. 1, Statement of Mitigating Reasons. The Government has no objections to the information, calculations and conclusions contained within the Revised Presentence Investigation Report and Addendum. Filing No. 112.

The court conducted a hearing on restitution and amount of loss issues on May 30, 2012, and June 13, 2012. The evidence adduced at the hearing showed that the defendant, on behalf of GSG, obtained several loans in 2005. Federal Bureau of Investigation Agent Michael Bailey testified that GE Capital had entered into agreements with GSG for two construction equipment, or hard-asset loans. Those loans were secured by construction equipment. No one testified with respect to GE Capital's losses.

Gary Seeger of UMB testified that the bank would not have loaned the defendant money if it had known of outstanding tax liabilities. UMB loaned the defendant $3,250,000 in May of 2005 and authorized an additional line of credit of $500,000 later that year. The loans were primarily secured by GSG's accounts receivables, and by a subordinate lien on equipment. In late 2005 and early 2006, Herink's company defaulted on the loans. The bank attempted to recoup collateral but was largely

unsuccessful in doing so because GE Capital had a first lien on GSG's construction equipment.  Mr. Seeger testified that UMB ultimately sustained a loss of $3,300,000.  He also testified that UMB mitigated its losses by attempting to recover and sell collateral.  It used the services of a recovery company, RTR Services, to collect and sell construction equipment.  It also solicited the assistance of GSG's foreman and hired people in Utah and Idaho to secure construction sites.  Further, he testified that the bank had taken a third-position lien on real property owned by Herink Farms, LLC, to secure the additional line of credit.  The bank eventually recovered $85,000 after suing the second-place lien-holder.

    Steven Walters testified he handles claims on surety and performance bonds for UFCC.  He testified the UFCC had a long-standing bonding relationship with GSG, but that UFCC would not have written the bonds had it known of the outstanding tax liabilities since failure to pay payroll taxes is a "red flag."  UFCC paid on bonds issued to GSG when GSG defaulted on payments to contractors, etc.  He testified that UFCC ultimately sustained a net loss of $1,794,959.35.  He further stated that UFCC collected from reinsurers to offset that amount, but could not quantify those reinsurance payments.  The parties later stipulated that reinsurance reduced UFCC's net actual loss to $1,011,026.91.

    Mark Poulsen is an attorney who represents EMCC.  He testified that EMCC relied on the veracity of GSG's financial statements in issuing performance bonds to GSG.  In August of 2005, EMCC issued a performance bond to GSG in the amount of $5,741,000.  He initially calculated EMCC's loss to be $970,000, but later calculated additional losses, arriving at a total loss of $1,778,000.  He, too, acknowledged that EMCC recouped some of the loss from reinsurers, but could not quantify the loss.  The

4

parties later stipulated that, after reinsurance, EMCC suffered a net actual loss of $800,000. The defendant testified to essentially the same facts that are recited in his Statement of Mitigating Factors, Filing No. 111, Ex. 1; Filing No. 126, Exhibit List, Hearing Ex. 100. He testified that the loans were originally secured by collateral in the form of construction equipment that had been appraised by GE Capital at $8,000,000. He stated the collapse of the housing market, particularly the market for second homes on golf courses, contributed to the inability of GSG to pay off the loans.

Based on the evidence adduced at the hearings, the court finds the that UMB Bank suffered an actual loss in the amount of $3,300,000; UFCC suffered an actual loss in the amount of $1,011,026.91; and EMCC suffered an actual loss of $800,000. No evidence was presented with respect to the alleged losses suffered by GE Capital (formerly TFS). The court concludes GE Capital was made whole by the sale of its collateral.

At sentencing, the defendant argued for a sentence of 18 months, of which 12 months and one day would be served in a custodial setting, plus six months of home confinement. Filing No. 129, Defendant's Sentencing Statement. The government urged the court to impose a sentence of 48 months, the maximum agreed to in the binding plea agreement. The Probation Office recommended a sentence of 51 months, the low end of the Guidelines range.

II. DISCUSSION

    A. Law

The Sentencing Guidelines are no longer mandatory. *United States v. Booker,* 543 U.S. 220, 260-61 (2005). Consequently, the range of choice in sentencing dictated by the facts of the case has been significantly broadened. *Gall v. United States,* 552

U.S. 38, 59 (2007) (finding a sentence outside the Guidelines to be reasonable); Kimbrough v. United States, 552 U.S. 85, 100 (2007) (noting that courts may vary from Guidelines ranges based solely on policy considerations, including disagreements with the Guidelines); Rita v. United States, 551 U.S. 338, 351 (2007) (holding that a district court may consider arguments that "the Guidelines sentence itself fails properly to reflect § 3553(a) considerations"); Cunningham v. California, 549 U.S. 270, 286 (2007) (stating that judges are no longer tied to the sentencing range indicated in the Guidelines but are obliged to "take account of" that range along with the sentencing goals Congress enumerated in 18 U.S.C. § 3553(a) of the Sentencing Reform Act). District courts must "give respectful consideration to the Guidelines," but are permitted "'to tailor the sentence in light of other statutory concerns as well.'" Kimbrough, 552 U.S. at 101 (quoting Booker, 543 U.S. at 245-46). These cases "mean that the district court is free to make its own reasonable application of the § 3553(a) factors, and to reject (after due consideration) the advice of the Guidelines." Kimbrough, 552 U.S. at 113 (Scalia, J., concurring).

The Sentencing Reform Act "contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing, including 'to reflect the seriousness of the offense,' 'to promote respect for the law,' 'to provide just punishment for the offense,' 'to afford adequate deterrence to criminal conduct,' and 'to protect the public from further crimes of the defendant.'" Kimbrough, 552 U.S. at 101 (quoting 18 U.S.C. § 3553(a)). The statute further provides that "in determining the appropriate sentence, the court should consider a number of factors, including 'the nature and circumstances of the offense,' 'the history and characteristics of the defendant,' 'the sentencing range established' by the

Guidelines, 'any pertinent policy statement' issued by the Sentencing Commission pursuant to its statutory authority, and 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.'" *Id.* (quoting 18 U.S.C. § 3553(a)).

Although the Guidelines remain "the starting point and the initial benchmark" in determining a sentence, the district court "may not presume that the Guidelines range is reasonable," but must "make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50. "[A]fter giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Id.* If the court decides that an outside-Guidelines sentence is warranted, the court must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. *Id.*

The three steps in the post-*Booker* sentencing process are: (1) "to determine the [initial] advisory guideline sentencing range," (2) to determine "any appropriate departures [upward or downward] from the guidelines[,]" and (3) to decide whether "to vary from the advisory guideline range based on the factors set forth in § 3553(a), so long as such a variance is reasonable." *United States v. Shannon*, 414 F.3d 921, 923–24 (8th Cir. 2005); *see United States v. VandeBrake*, 679 F.3d 1030, 1041 n.7 (8th Cir. 2012).

Congress established the Sentencing Commission ("the Commission") "to formulate and constantly refine national sentencing standards," in fulfillment of its important institutional role. *Kimbrough*, 552 U.S. at 108. When operating within that institutional role, the Sentencing Commission "has the capacity courts lack" and can

7

"'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise.'" *Kimbrough*, 552 U.S. at 109 (quoting *United States v. Pruitt*, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)).  In formulating the Guidelines, the Commission developed and used data on past practices and recidivism.  *See* United States Sentencing Commission, Fifteen Years of Guidelines Sentencing (Nov. 2004) ("Fifteen-Year Assessment") at 14; U.S.S.G. § 1A.1, intro. comment., pt. A, ¶ 3; *Kimbrough*, 552 U.S. at 96; *Gall*, 552 U.S. at 46 (noting that the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions").  Accordingly, in many cases, the Guidelines are a reasonable estimation of a fair sentencing range.  *See Kimbrough*, 552 U.S. at 109.

For policy reasons, the Commission did not employ its characteristic empirical approach when setting the Guidelines ranges for white-collar crimes.  Fifteen-Year Assessment, Executive Summary at vii, 15, 56 (stating that important considerations led the Commission to depart from past practices for crimes such as fraud).  The Commission found that its "study of past sentencing practices revealed that in the preguidelines era, sentences for fraud, embezzlement, and tax evasion generally received less severe sentences than did crimes such as larceny or theft, even when the crimes involved similar monetary loss," noting that a "large proportion of fraud, embezzlement, and tax evasion offenders received simple probation."  *Id.*, Executive Summary at vii.  The Commission sought to correct this past under-punishment of "white collar" crimes, based on its determination that "penalties for some types of crime, such as 'white collar' offenses, were disproportionately low compared to other types of theft involving similar economic losses."  *Id.* at 15, 38.  Accordingly, the Commission

8

drafted guidelines to reduce the availability of probation and "to ensure a short but definite period of confinement for a larger percentage of these 'white collar' cases, both to ensure proportionate punishment and to achieve adequate deterrence." *Id.*, Executive Summary at vii. In establishing sentences for economic offenses, the Commission made the pecuniary loss resulting from the crime a primary consideration in determining sentences. *Id.* at 55. "The use of imprisonment for economic offenders also has increased steadily throughout the guidelines era." *Id.*

The Guidelines for white collar crimes have also been influenced by numerous formal statutory directives by Congress. *Id.* at 21-22 n.17. Over the years, Congress mandated adjustments of increasing severity to the Guidelines sentences for fraud. *Id.* at 56; *see, e.g.*, Pub. L. No. 103-322, § 2536, § 250003, 108 Stat. 1796 (Sept. 13, 1994) (directing the Commission to review and, if necessary, amend the guidelines to ensure that sentence enhancements for telemarketing fraud and fraud against the elderly were adequate); U.S.S.G. Manual, App. B (listing additional aggravating adjustments to the fraud Guidelines); U.S.S.G., App. C, Amend. 617 (Nov. 1, 2001) (amendments under the "economic crimes package" increased sentences for offenses involving large numbers of victims and larger monetary losses); *see also* United States Sentencing Commission, Report to Congress, Increased Penalties under the Sarbanes-Oxley Act of 2002 (January 2003) (amendments significantly increased guideline penalties under U.S.S.G. § 2B1.1 as directed by the Act).

The Guidelines ensure that offenses involving the greatest monetary losses, the use of more sophisticated methods, and other aggravating factors are given imprisonment. Fifteen-Year Assessment at 57. Notably, "slightly more than 40 percent of both responding district and circuit court judges also would like greater availability of

sentencing options (particularly probation-plus-confinement or "split" sentences) for theft and fraud offenses." *Id.*, Summary Report on the U.S. Sentencing Commission's Survey of Article III Judges at 4.

Under the Guidelines, the amount of loss by fraud is generally "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, cmt. n. 3(A).  For Guidelines purposes, a district court is charged only with reasonably estimating the loss using a preponderance of evidence standard "[b]ecause the damage wrought by fraud is sometimes difficult to calculate." *United States v. McKanry,* 628 F.3d 1010, 1019 (8th Cir. 2011); *see also* U.S.S.G. § 2B1.1, cmt. n.3(C) ("The court need only make a reasonable estimate of the loss").  The amount of loss suffered by a lending institution in the case of fraudulently-obtained loans is the amount of the fraudulently obtained loans "minus any payments made on the loan principal and the value of the collateral at the time of sentencing." *United States v. Parish*, 565 F.3d 528, 535 (8th Cir. 2009); *see also United States v. Alexander*, 679 F.3d 721 (8th Cir. 2012).  If the amount of loss is affected by market conditions, "[t]he appropriate test is not whether market factors impacted the amount of loss, but whether the market factors and the resulting loss were reasonably foreseeable." *Parish*, 565 F.3d at 1019.

Pursuant to the Mandatory Victim Restitution Act, 18 U.S.C. § 3663 *et seq.*, the determination of the amount of restitution to be awarded after a fraud conviction "includes first identifying the victims of the defendant's conduct and then determining the full amount of each victim's losses." *United States v. Frazier*, 651 F.3d 899, 903 (8th Cir. 2011).  Although the amount of loss calculation under the Guidelines looks to the greater of actual or intended loss, the amount of restitution under the MVRA "cannot exceed the actual, provable loss realized by the victims." *Id.* at 905. "The government

bears the burden of proving the amount of restitution based on a preponderance of the evidence." *Id.* at 903.

> B. Analysis
>
> > 1. Initial Guidelines Calculation

The court finds that the defendant's objection to the amount of loss should be sustained in part and overruled in part. The court finds the government has established by a preponderance of the evidence that the loss for Guidelines purposes is $6,872,959.35. The Guidelines loss calculation does not include any loss to GE Capital because there was no evidence that the defendant intended to cause or caused any loss to GE capital. The court finds that the defendant has not sustained his burden to show that UMB's efforts to recover collateral were inadequate or commercially unreasonable. Although many factors may have contributed to the eventual demise of the defendant's business, those factors were reasonably foreseeable.

The court generally accepts the other facts set forth in the PSR and finds the defendant's base offense level is 7 plus an increase of 18 levels for a loss between $2,500,000 and $7,000,000 under U.S.S.G. 2B1.1(b)(1)(J) & (K), resulting in an adjusted offense level of 25. After an 3-level adjustment for acceptance of responsibility, the defendant's total offense level is 22. At criminal history category I, the defendant's sentencing range of imprisonment is 41 to 51 months.

> > 2. Departure

The defendant's motion for departure is more in the nature of a motion for an outside-Guidelines sentence and will be discussed below.

3. Section 3553 factors

The court finds the defendant's motion for a variance or sentence outside the Guidelines should be granted. In consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a), the court finds that a sentence of 18 months is sufficient, but not greater than necessary to accomplish the goals of sentencing.

With respect to the nature of the offense, the court notes that the crime at issue is undoubtedly a serious offense. There is an important public interest at stake in the ability of lenders and bonding companies being able to rely on the veracity of financial statements. Mr. Herink's actions caused a significant loss to UMB and the bonding companies. However, there is no evidence that Herink profited from his fraudulent acts, and that fact tempers his culpability to some degree. Nevertheless, the court finds that a sentence that includes some period of incarceration is necessary to achieve some level of proportionality to economic crimes such as theft and burglary and to reduce the perception of unwarranted disparity based on socioeconomic status.

The court has also considered the history and characteristics of the defendant in fashioning this sentence. *See* 18 U.S.C. § 3553(a)(1). Herink has no criminal history and, aside from the fraudulent conduct at issue in this case, appears to be a law-abiding and productive citizen. This is his first offense and can be viewed as an aberrant act in his otherwise law-abiding life. He is employed and is actively involved in the lives of his six children. Some measure of circumstances beyond his control contributed to the losses incurred in this case. Also, he has shown remorse for his actions and the court believes that remorse is sincere.

In formulating this sentence, the court has considered the sentencing range established by the Guidelines, but, because the fraud offense Guidelines were

promulgated pursuant to Congressional directive rather than by application of the Sentencing Commission's unique area of expertise, the court affords them less deference than it would to empirically-grounded Guidelines. The Guidelines calculation, driven as it is by the substantial amount of loss incurred in this case, is one measure of the seriousness of an offense, but is not always a reliable proxy for the culpability of an individual defendant.  When losses amount to millions of dollars, the Guidelines' graduated system of increasing culpability aligned with increasing loss is especially skewed.  In this case, the amount of loss was magnified by a combination of factors, many of which were beyond the defendant's control.  If not for those circumstances and changing economic conditions, Herink might have been able to mitigate the losses through the sale of collateral and property.

Although the amount of loss in this case is immense, the scheme to defraud is not sophisticated or complex.  Herink is a businessman who made several poor business decisions that ultimately resulted in the failure of his business.  Aside from the material misrepresentations involved in this case, his conduct is not much different than that of many small business owners falling on hard times.  To sentence Herink as if he were wholly responsible for the total loss would exaggerate his culpability and would not be an accurate measure of his blameworthiness vis-a-vis others charged with arguably more sophisticated and far-reaching fraudulent schemes.

This sentence also satisfies the need to avoid unwarranted sentencing disparities.  This sentence is proportional to other sentences imposed on criminals who have committed white-collar crimes.  *See, e.g., United States v. Herg*ert, 4:09CR3019 (6 months home confinement and 60 months' probation for financial institution fraud of $3,000,000); *United States v. Trierweiler*, 4:10CR3044 (probation for tax evasion loss of

13

$258,154); *United States v. Weaver*, No. 4:10CR3045 (probation for tax evasion loss of $224,366); *United States v. Snoozy*, No. 4:10CR3009 (one year probation for willful failure to file taxes with a $77,000 criminal tax loss); *United States v. Kohll*, No. 8:04CR409 (one year of probation for a mail fraud scheme involving loss of $500,000); *United States v. Cherek-Ramirez*, No. 8:10CR419 (five years' probation for a mortgage fraud scheme involving $423,000 in loss); *United States v. Therese M. Kehoe*, No. 4:06CR3010 (five years' probation for a mail fraud scheme involving loss of $283,766); *United States v. Weber*, No. 8:08CR209 (2-year term of imprisonment for embezzlement of $467,868); *United States v. McDade*, No. 8:03CR499 (6 months imprisonment for a $440,194 fraud); *United States v. Lenagh*, No. 8:07CR346 (two-year sentence in a case involving $1,395,000 in health care losses).

This sentence also satisfies the purposes of sentencing. A sentence of 18 months reflects the seriousness of the offense, promotes respect for the law and provides just punishment. Eighteen months is a significant sentence to an offender who has never been incarcerated at all. A sentence that includes some period of imprisonment, and not merely probation, for this sort of crime will enhance the public's confidence in the criminal justice system. The court notes the defendant has already suffered serious consequences as a result of his crime. He has lost his business and his stature in the community and he will suffer the stigma of a felony on his record. These factors, along with the fact of incarceration, will serve to deter others from engaging in similar criminal conduct. The court finds the value of any additional prison time as a deterrent would be marginal. The defendant is unlikely to reoffend, so this sentence is more than sufficient to protect the public from further crimes. Society is also

protected from future crimes by this defendant by the court's imposition of supervised release.

The court will order restitution in the total amount of $5,111,026.91, payable as follows: $3,3000,000.00 to United Missouri Bank; $1,011,026.91 to United Fire and Casualty Co.; and $800,000.00 to Employers Mutual Casualty Co. The court finds no restitution should be awarded to GE Capital because GE Capital presented no evidence of loss and the court concludes it was made whole by the sale of the collateral.

A Judgment and Commitment and a Statement of Reasons in conformity with this sentencing memorandum will issue this date.

DATED this 30th day of July, 2012.

BY THE COURT:

s/ Joseph F. Bataillon
United States District Judge